MEMORANDUM OF DECISION
Charles Alexander B., known as Alex, is the subject of a petition brought on January 31, 1997 by the Department of Children and Families, hereafter the "DCF", alleging that Alex is an uncared-for child as his parents, Diane B. and John K., cannot provide for the specialized care which his physical, emotional or mental condition requires. The petition was amended on March 24, 1997, adding that he would be permitted to live under conditions, circumstances or associations injurious to his well-being, if allowed to live with his parents, the "predictive neglect" allegation. Alex was born January 25, 1997 and pursuant to an order of temporary custody, was not released from the hospital to CT Page 6727 his parents, but placed in a foster home. The termination of parental rights petitions for his two older twin siblings. Antony and Thursten B., born December 30, 1994, were consolidated with Alex's case. The twins were also not released to the care of their parents, but placed into foster care pursuant to court order in February of 1995. On May 30, 1996, they were both adjudicated uncared-for children. The present termination petitions were brought on February 19, 1997 by counsel for the children, in which petitions the Department joins. Earlier termination of parental rights petitions had been filed by DCF on May 17, 1996, which were later withdrawn. Since the summer of 1997, the twins have been in the care of Diane B.'s brother and sister-in-law. Her relatives wish to adopt them. Alex has been in the care of another of Diane's brothers and his common law wife. They are seeking to have Alex continue in placement with them. None of the children has ever been in the day-to-day care of their biological parents, having been removed from the hospital shortly after birth and placed in foster care.
The petitions for termination of the parental rights of Diane B. and John K. to their twin sons allege acts of omission and commission on the part of the parents as well as their failure to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of these children, the parents could assume a responsible position in the life of the children. Connecticut General Statutes § 17a-112 (c)(3)(C) and (B). At the conclusion of the trial, in her brief, the Petitioner did not seriously address the claims to the omission and commission grounds, and proceeded on the failure to rehabilitate allegations. The court therefore treats the allegations of commission and omission as abandoned. In addition, the respondent parents have filed motions to have a transfer of guardianship of the twins and Alex to the maternal relatives. At the conclusion of the trial, each of the parents acknowledged that neither one is seeking a return of the children to their care at the present time.
The court finds that the mother and the father of the children have been duly served, have appeared and have court-appointed attorneys. The court further finds that there is no other action in any other court effecting the custody of these children. Each of the parents energetically contested the claims of the Department in the uncared-for and neglect petition as well as the termination of parental rights petitions brought by counsel for the children. While the last day of trial took place CT Page 6728 on December 15, 1997, the court permitted the filing of briefs. Due to unforeseen circumstances in securing relevant portions of the trial transcript, the briefing schedule had to be extended. The time for filing of reply briefs was March 25, 1998, on which date the matter was officially concluded. Further, in the briefs, respondent father alleges certain post trial facts. The court treats these asserted facts as stricken as no motion to reopen and for direct testimony was ever sought to be offered regarding those facts.
1. MOTIONS FOR BIFURCATION AND SEVERANCE
As a preliminary matter, counsel for the respondent father had filed a motion to sever the pending cases and argued at trial that severance and bifurcation was required. He claimed that presentation of facts and evidence as to both adjudicatory and dispositional phases of the termination petitions and the neglect petition was highly prejudicial to the respondent father and should not be permitted. Our courts have previously held that the decision to bifurcate the trial into two hearings, one on adjudication and the other on disposition, is within the discretion of the court. As stated In re Jose C.,11 Conn. App. 507, 509, 507 A.2d 293 (1987):
 "the trial court concluded that it could properly distinguish the evidence presented on the distinct issue, and make its determination of whether to grant the petition in accord with the statutory standard of proof."
In the case of In re Juvenile Appeal (84-AB), 192 Conn. 254, 266,267, 471 A.2d 1380, (1984), the court set forth the correct procedure:
 "while much of the evidence on which a finding of neglect on a neglect petition has been based, may also be evidence concerning the denial of the necessary care, guidance or control in a termination of parental rights petition, the trial court must examine such evidence ab initio and in a new light".
In a footnote, n. 13 at p. 267, the court in that case further noted that:
"In a situation such as the instant case, where the same CT Page 6729 evidence is relevant to two different proceedings and the proceedings are governed by different standards of proof, it is not necessary that the evidence be presented twice to the same trial judge. In considering the termination of parental rights petition, although the trial court may not rely upon the findings of neglect, the trial court may rely upon the evidence that warranted a finding of neglect." (Emphasis in original).
In the cited case, the issue concerned two petitions about the same child, a slightly different circumstance than the one before the court involving termination petitions for two children and a neglect petition for a third. Yet, the legal issues are no different in the present circumstances before the court.
The respondent father argues further that such simultaneous hearings in addition to the neglect hearing regarding the youngest child are fundamentally unfair to him and that he did not have sufficient time to formulate appropriate dispositional plans for the children. The court rejects the later argument, as the twins have been in foster care since 1995 and Alex since 1997. Had father realistically expected to be able to have the children in his care, he had more than adequate time to formulate a plan. As to the constitutional claims raised, the court notes that John K. has been provided with all of the procedural due process rights to which he is entitled; notice of all claims against him by virtue to the petitions served, court-appointed counsel throughout the time of the children's placement, and a full opportunity to be heard and to present evidence at trial in support of his claims.
In this context, the court also rejects any substantive due process claims. The court is mindful of the obligation to view the evidence concerning the neglect petition from a fair preponderance of the evidence standard and the evidence concerning the termination petitions from a clear and convincing evidence standard. The court is able to appropriately consider the relevant facts and to separate those which relate to and bear upon the issue of disposition and to consider them only after a decision has been made as to whether or not the adjudicatory grounds have been proven. Further, as a matter of judicial economy, bifurcation would have the court hear much the same evidence again on the issue of disposition, as many of the same witnesses would be called and present testimony as to events occurring after the adjudicatory dates. Such duplication of CT Page 6730 effort serves no one. Accordingly, the motions to sever and for bifurcation are denied.
Having heard the testimony of the court-appointed evaluators and the many witnesses during five days of trial, the court makes the following findings based on the evidence and the reasonable and logical inferences, which are drawn from that evidence:
 2. FACTS
A. As to the mother, Diane B.
Diane's life history since her teenage years followed an initially promising path and then, with her decision to terminate the regular use of psychotropic medications, exhibited a swift descent into the chaotic life and significant daily problems of a diagnosed psychotic individual, whose disability is not mediated through medication. Diane, according to her family, was diagnosed as having a mental disease as a teenager and was hospitalized on two separate occasions. She achieved stability and a high level of functioning with the regular use of medication and was able to earn a college degree and had almost completed all work to receive a degree in registered nursing when her descent began.
Diane grew up in a family of six children in Maine; she is the fourth child and she enjoyed a normal childhood by all reports. When she was in high school, her illness began to manifest itself and it was then that she was first diagnosed as suffering from a mental illness. She remained at home for a number of years and was hospitalized in 1983, at age twenty-seven, during which time she received psychiatric services. She began a course of medication which permitted her to continue a stable life. When she was twenty-nine, she moved to Connecticut to reside with an aunt while attending college. She received her bachelor of sciences degree from the University of Connecticut in 1989. At that time, she was working at the Hughes Medical Center and doing well. She then secured her own apartment and was a few months away from graduating from the nursing program at St. Francis School of Nursing, when she stopped taking her medication completely in 1991. After she stopped taking her medication, her life grew more and more chaotic and by 1994, she was living in shelters and had begun her turbulent relationship with John K., the father of her three children.
On December 30, 1994, Diane gave birth to Antony and CT Page 6731 Thursten, who were born prematurely at twenty-seven weeks of gestation. She had been living with their father, John K., for some months, but had moved out because he was physically abusive to her. She had not had appropriate prenatal care and she was actively psychotic during their birth and had to be forcibly restrained during delivery. After her recovery, she was transferred to a psychiatric ward and then released from the hospital while the twins remained in care. The twins had no unusual medical problems, but required further hospitalization due to their premature birth. Despite the opportunity, Diane did not visit them regularly at the hospital.
The DCF case worker initially assigned, Kerry Bell, testified that Diane's had been identified as a high risk pregnancy as she did not seek regular prenatal care and was living in a shelter at that time. She testified that at the shelter in which Diane lived, her room was full of empty bottles of alcohol. Diane was uncooperative with the Department, resistant to treatment upon her discharge and did not take part in the services offered to her to be able to parent the twins and have them discharged from the hospital into her care. Those individuals observing Diane at that time with her twins found her apathetic and not interested in learning how to care for them.
In February, 1995, John K. had begun to search the shelters for Diane's whereabouts. He had no idea that she was pregnant, he testified, as Diane had apparently never told him about her pregnancy. A letter he sent came to the attention of Kerry Bell and she contacted him. He was shocked to hear the news, but then began contact with Diane and also visited the twins while in the hospital.
Despite offers of assistance, Diane did not follow her medication regimen and refused the various services provided to make it possible for her to take the twins home. DCF sought and secured an ex-parte order of temporary custody for both children on February 10, 1995 (Lavine, J.)
In the spring of 1995, Diane was admitted to Cedarcrest Regional Hospital where she remained for one month. Her diagnosis was schizo-affective disorder. That diagnosis has remained unchanged with the individuals who have seen her since that time, whether for treatment or evaluation pursuant to court order. Elizabeth Villotas, a psychotherapist employed by Hartford Community Mental Health services, testified. She saw Diane for CT Page 6732 treatment beginning in December of 1995 and through May of 1997 on a regular basis. She stated that Diane has a "psychiatric illness of sufficient severity to require regular treatment and medication. She has delusional ideas and trouble keeping organized enough for her own care and is extremely unlikely to be able to do so for others, especially young children." She stated that Diane's relationship to the children's father sounded volatile and there were questions of domestic abuse. Diane sometimes admitted it was happening and sometimes she denied the existence of the abuse. She stated that on one occasion she observed Diane with a black eye, although Diane did not tell her what or who had caused the injury to her eye. She stated that she believed the "relationship was not good for her mental health and functioning".
An additional issue was the suspicion of alcohol abuse by Diane. Ms. Villotas stated that she smelled alcohol on Diane on occasion and confronted her about it. It was a concern for Diane to be drinking with the medication she received for her illness. "The effect of such consumption on the disorder," she stated. "is very sedating and would cause some further disorganization in thinking."
The court-appointed psychologist, Dr. Robert Meier, who evaluated the biological parents, also testified. He found in his report dated May 26, 1997[2], after his second evaluation of Diane that her:
 "personality evaluation results present a profile that is consistent with individuals who have serious emotional problems. Those with this pattern generally lack self-confidence and self-esteem. They tend to be isolated from others, are distrustful, and are seriously lacking in social skills. Their lifestyles are often characterized as schizoid. Thinking is often autistic, fragmented and tangential. There is difficulty concentrating and feelings that things are not real may be present."
Based on a review of her medical records, he had previously found that while on medication, Diane's condition improved. Nonetheless, he noted, "even when under treatment, there are episodes where she had problems in concentration, loose association, and flat affect. . . . Such characteristics may affect her ability to follow through with expectations regarding her children."[3]
CT Page 6733
The court received testimony about Diane's inability to follow through with expectations set for her and to benefit from services offered to her. The expectations for Diane, set by the court on May 23, 1996[4], required Diane to attend parenting classes, to visit the children as often as DCF permits, to participate in individual and family counseling, a drug and alcohol assessment and to follow the treatment recommendations and her medical regimen, to address issues of domestic violence, to secure and maintain adequate housing and income, no substance abuse and to participate in psychiatric treatment as recommended by the treating physician.
Diane attended four sessions of the Advanced Education and Parent Skills Training Program and was referred to additional parenting classes to meet her needs. She then, together with John K., attended the Catholic Family Services reunification program in the spring of 1997. The program facilitator, Ms. Isabel Perez, testified to the participation of the parents in the program. She stated that Diane B. did not interact with her children and "could not perform during the parent-child sessions." The parents were discharged from the program after three weeks. Neither completed the twelve week program which included visitation with their children and a weekly educational component for parenting skills in a group session[5]. The team of workers from the program concluded that this was not the right-program for these parents, as both were very limited in their interactions with their sons.
By November of 1997, it was clear to DCF that Diane had not maintained "consistent use of her prescribed medication to control her behavior and emotions and that the inconsistency has posed a serious threat to her ability to provide even basic physical and emotional care for the children."[6] Diane had only sporadically been involved with the Hartford Community Mental Health Center and it was apparent that she continued to resist taking her medication regularly. When she did take it, testified Ms. Villotas, she did not take it as prescribed, using a thirty day supply for sixty days or more, for example. This reduced not only the effectiveness of the medication during the time she was taking it on a reduced basis, but also impaired its future use. Ms. Mendes, the present DCF caseworker, testified that Diane s mental health issues remained of concern to DCF from the time the case was transferred to her in July of 1997 to the time of trial in December of 1997. CT Page 6734
On occasions, Diane displayed the paranoid behavior to which Dr. Meier had made reference in his report. Such behavior was observed by Catherine Foss, a nurse from the St. Francis Home Health Agency who visited Diane in her home nine times between October of 1996 and January of 1997 prior to Alex's birth. She reported that Diane believed her family was trying to take her children away. Diane stated that it was unfair that she had never had the twins and she had no chance to parent them. Ms. Foss stated that during one visit Diane was incoherent, in the other room from where she and John K. sat and grunting. She also observed evidence of domestic violence and saw her in December with a black eye, although Diane did not talk to her about it. Ms. Foss, based on her observations and Diane's behavior, signed an affidavit at the time of Alex's birth in 1997, expressing her concerns about Diane's failure to follow her prenatal care, her psychiatric regimen and continuing in a violent relationship. Her concern was that the newborn child would have a safe and stable environment, which she did not believe the biological parents were capable of providing.
Two other health care professionals involved with Diane around the time of the birth of her third child, Alex, on January 25, 1997, Ms. Kubick-Balicheski, a registered nurse at St. Francis Hospital, and Harriet Sternthal, a licensed clinical social worker there, testified. Ms. Kubick-Balicheski testified that she saw Diane seven times in 1996 and early 1997 prior to Alex's birth. She saw bruises on Diane's forearm on January 18, 1997, which Diane stated were inflicted by John K. She also remembered seeing bruising in November of 1996 around Diane's eyes and chin. She was concerned for Diane's safety and for the coming baby.
Ms. Sternthal saw Diane when she was hospitalized and after the birth of Alex. She testified she saw Diane three times. Diane admitted to her that John K. hit her and also that she returned the abuse by hitting him. Mrs. Sternthal's concerns centered around the history of domestic violence between the two parents and the psychiatric issues in Diane's life. She stated that she questioned the parents' ability to makes decisions about their own lives, let alone the life of their child. Based on the statements of these professionals, DCF secured an ex-parte order of temporary custody of Alex on February 10, 1997.
There is no evidence that Diane ever completed an alcohol assessment or treatment program, dealt with the domestic violence CT Page 6735 issues in her life, her transient housing or income until recently, when she became eligible for social security disability income. DCF offered an alcohol assessment with Advanced Behavioral Health, but Diane denied she had a problem and did not attend. Ms. Bell, the DCF social worker, testified that she made two appointments for Diane and provided her with information and offered transportation. Diane did not attend, "she was agitated and all she wanted was an attorney." Ms. Bell then offered her transportation to an attorney, which was also refused. Ms. Bell further testified that Diane has been unable to maintain housing and had been intermittently homeless, living in shelters. The present case worker testified that since the transfer of the case to her in July of 1997, Diane had five temporary living situations.
Diane also did not consistently admit to being in an emotionally and physically abusive relationship. She had reported that John K. was emotionally and physically abusive to her to other service providers during the time of Alex's birth and such providers testified they had seen the evidence of such abuse. Also, she admitted that there was domestic violence in her relationship with John K. to Dr. Meier during the evaluation. Nonetheless, as Ms. Villotas testified, Diane resisted discussing these issues in their therapy sessions. She has never been receptive to counseling and assistance for domestic violence.
Visitation, which was offered only on a supervised basis, confirmed the same behaviors. Diane's behavior was variable, sometimes she was able to interact on a limited basis, and sometimes she was not. Not only was her behavior unpredictable, but she and John K. were not attentive to their children, their needs and their safety, Ms. Bell testified. On one occasion in March of 1996, Ms. Bell testified, Diane was groggy from medication and disoriented. Her eyes rolled back in her head and the twin she was holding slipped off her lap and hit his head on the floor. After this event, Ms. Bell required that Diane see a physician before visits could resume. It was some three months before Diane saw a physician and supervised visits then resumed. She also did not consistently visit when visits were offered. Since the children have been placed with her relatives in Maine, there has been limited visitation in Connecticut, supervised by the children's caretakers. All those caring for the children are prepared to permit continued contact between the children and their biological parents on a limited basis. CT Page 6736
Diane's ability to care for any of her children has not improved over time. After Alex's birth, Dr. Meier noted after a parent child interaction session:
 "While mother seems to have some affectionate feelings for Alex, it is questionable whether she could care for him on an ongoing basis, or could show the needed judgement to meet his needs."
Dr. Meier testified at trial that he believed that all three children were in need of stability, consistency and permanency as soon as possible. When questioned about the transfer of the children's guardianship to their maternal relatives, he stated that there was "a long term risk that by not having the children permanently placed somewhere opens up the opportunity that their lives would be disrupted later."[7] In a previous written response to certain questions posed to him, Dr. Meir had indicated that such a transfer would be a good outcome. When he testified, he stated he had believed at that time that this would be least disruptive to the family. He stated that he had also assumed that there was an agreement with the guardians. He found that Diane was not able to care for her children. He was pessimistic about her ability to do so in the future, given her serious psychiatric problems and her unwillingness to address those problems.
Diane's psychiatric difficulties are the focus of her claim that the Americans with Disabilities Act, hereafter "ADA",42 U.S.C. § 12131
et.seq. prohibits the termination of her parental rights. While the court has sympathy for the mother's difficult position of facing the prospect of losing her children through no fault of her own, but due to her illness, the court nonetheless must carefully consider all of the facts as they relate to the issues raised. Diane argues that DCF failed to comply with its obligations to her under the ADA to offer certain accommodations to her on account of her psychiatric disability. However, the court notes that in the context of a termination of parental rights case, it is the conduct of the respondent that is the focus of the court's inquiry, not the disability. In re Marvia R.
1997 WL 178082 (Conn.Super.) (Foley, J.). From the evidence, the court concludes that Diane rejected many of the services offered to her, rejected her need to be stabilized with the help of regular medication and did very little to attempt to rehabilitate herself. Also, the ADA regulations adopted state that:
"Nothing in this part will be construed to require an CT Page 6737 individual with a disability to accept an accommodation, aid, service, opportunity or benefit provided under the ADA or this part which such individual chooses not to accept." 28 C.F.R. § 35.130 (e).
The court has previously found, from the clear and convincing evidence, that Diane did not choose to accept services from DCF. Further, she did not raise a claim during the time that services were actively being offered to her that additional or different services were needed to assist her because of her disability. The court notes that during most of her years of involvement with DCF, she had court-appointed counsel who could have raised such a claim.
The court further adopts the reasoning set forth in In reMarvia R. that the ADA does not apply to actions for termination of parental rights. The analysis relied upon in the case of Inthe Interest of Torrance P., 187 Wash.2d 10, 6552 N.W.2d 243, 245, 246 (1994) is persuasive.
 "the duty to make a diligent effort to provide court-ordered services is defined by TPR (termination of parental rights) statutes and not the ADA. The ADA does not increase those responsibilities or dictate how those responsibilities must be discharged. . . . Thus, while [the father's] developmental disability must be considered in determining the reasonableness of the County's efforts, neither his disability nor the ADA changes the inquiry or the County burden of proof.
The court holds that the ADA does not apply to actions for termination of parental rights and cannot be used as a defense against such proceedings. This conclusion does not vitiate the need of DCF to provide reasonable services for reunification or for the court to engage in a searching inquiry as to whether such services were provided by clear and convincing evidence. In reEden F., 48 Conn. App. 290 (1998). The court, for the foregoing reasons, concludes that Diane s claim pursuant to the ADA must fail.
 B. With respect to the father, John K.
John K., the father of the three children, as stated, was initially unaware that Diane was pregnant with the twins. He and Diane have had a volatile relationship since 1994. He testified at trial that until hearing the testimony presented at the trial, CT Page 6738 he had been unaware of the extent of Diane's psychiatric problems. He denied that there had been any domestic violence between them, saying that if anything occurred, it was usually Diane who was out of control.
At trial, he testified that he still did not fully understand why the twins are in foster care. Nonetheless, he testified that he believed that they were being well cared for by Judy and Roger B., Diane's brother and his wife. He admitted that he could not take care of the children at the present time, but that he could see this possibility in the future. He also admitted that he had not fully complied with the expectations established for him. He did not believe that he and Diane would get together again to parent the children, but that perhaps he could do so himself with the help and assistance of others. He was in support of the motion for transfer of guardianship of all the children at this time.
John K. was previously married and has three other children with whom he has no regular contact. He exhibited little or no ability to interact with or care for the children of his relationship with Diane when he had supervised visitation with them. He was a passive observer and had to be told when to change them, how to hold them and what to do, the DCF social worker Kerry Bell testified. He did not bring snacks for them. He was no more attentive to the children and their needs than was Diane. She stated that during the visit in which one of the twins fell off of Diane's lap, John was present and did not respond at all. He did not get up to help and did not encourage Diane to get medical help. She stated that there were a host of issues that his behavior presented and that he needed many different services. She attempted to develop a plan to assist him to obtain assisted housing, counseling, alcohol assessment, parenting classes and couples therapy. John K. did not pursue any of these offers of assistance. For counseling, he used a counselor at his place of employment, not the one he was referred to by DCF. During her time on the case until October of 1996, Ms. Bell stated she saw no evidence of rehabilitation and believed in 1996, that termination of his parental rights was appropriate.
John K., like Diane, was evaluated by Dr. Meier in 1996 and in 1997. Dr. Meier found in 1997:
"Mr. K. seems to have difficulty in asserting himself in appropriate ways, and may attempt such assertiveness in CT Page 6739 more unusual or odd approaches. His poor social skills and poor coping skills is consistent with those who have domestic problems. . . . Mother and father have little insight into their problems, their limitations and the difficulties in the relationship. Father denied the need for any services or any problems."[8]
Dr. Meier's opinion was that in 1996, John K. had not rehabilitated sufficiently to care for the twins. In 1997, he could not care for Alex. During the second evaluation, John. K had a flatter affect and was more withdrawn, Dr. Meier noted. There were issues of judgment and the reliability of his statements and decisions. He stated that he questioned John K.'s ability to set appropriate boundaries for his own behavior and was concerned about domestic violence.
One of the issues of concern for Dr. Meier was his inability to make appropriate judgments, as evidenced by his substantial pro se filings with the court in this case. Those filings and the threatening nature of some of the assertions contained within those filing required that the court issue a restraining order. The court took judicial notice of the pleadings filed by John K. on his own behalf and concurs with Dr. Meier's analysis that they reflect a substantial lack of judgment on the part of the father.
At trial, Dr. Meier testified that he tentatively diagnosed John K. as having a personality disorder, which he defined as "a pattern of personality characteristics . . . a set of traits and characteristics which become attached to a person over a period of time."[9] He stated it is a chronic and long term condition. The prognosis for rehabilitation within a reasonable time was poor. He had grown more certain of this over the period of time because of the lack of any change on John's part. He supported permanence for all three children.
Father claims that he complied with the expectations and that the termination of the intensive reunification program at Catholic Family Services was inappropriate. The court cannot credit these claims. John K. did not complete a parenting education program, did not address issues of domestic violence and was no closer to being able to provide for the children at the time of the filing of the termination petitions that he had been earlier. In view of the overwhelming evidence at trial, John K. had no idea how to minimally parent the twins or Alex and his CT Page 6740 understanding did not improve over time. Ms. Perez testified that neither he nor Diane showed much capacity to parent the children in the interactional sessions. The court finds that his parenting skills were inadequate, that he did not learn by demonstration and suggestion and that his own testimony at trial provided the court with an opportunity to assess his understanding.
While he is concerned about his children and wished to do what is in their best interests, his behavior during those times when he had an opportunity to parent reflects his demonstrable deficits.
 C. With respect to the three children:
Both of the present foster mothers testified concerning the children. Judy B. is the primary caretaker, together with her husband of the twins, Antony and Thursten. She stated that the twins, who had previously been in multiple foster home placements before they came to her in July of 1997, had some speech delays. They have been receiving therapy and have improved markedly, now speaking in whole sentences. They are doing well in Maine and enjoy playing outside, including in the snow. She stated that they have both adjusted well to their family. She and her husband are committed to caring for the children until they become adults and are willing to adopt them or to be their permanent caretakers.
Michele Harmon, the common law wife of another of Diane's brothers, and the caretaker of Alex, also testified. Alex has been in her care for four months. He has been diagnosed with mild cerebral palsy. He receives physical therapy three times a week. Medical examinations and CAT scans indicate that he may need surgery and braces to walk and that he will need special care. She stated that she spends all day with Alex working on his physical needs. Alex requires special handling and physical stimulation as he does not respond in the same way as babies without his impairment. His special medical needs did not impact her commitment to care for this child, although she testified that she and her husband require the assistance of the state, due to his medical needs. She stated a transfer of guardianship to her and her husband would, to her knowledge, cut off such benefits, which they needed. She stated that she did not want to see him suffer multiple placements as had happened to his brothers and wanted him to know his family.
 3. ADJUDICATION
CT Page 6741 A. Charles Alexander B.
The court concludes by a preponderance of the evidence that as of March 24, 1997, neither Diane B. nor John K. could provide for the specialized care which Alex's physical, emotional or mental condition requires. As found, they can barely provide for their own needs, never mind the complex and daily strenuous care that Alex requires, to which his foster mother testified. His neurological impairment will require specialized care beyond that required for ordinary children. Such care is unfortunately beyond the capacity of either John K. or Diane B. to provide. The court also finds from a preponderance of the evidence as of March 24, 1997 that Alex, if returned to either his mother or father, would be permitted to live under conditions, circumstances or associations injurious to his well-being. Neither parent is able to care for Alex at the present time and neither parent is seeking his return immediately. John K. believes that Alex's present placement is appropriate and supports its continuance under a transfer of guardianship. The court adjudicates Alex an uncared-for and neglected child.
 B. Antony and Thursten B.
The court concludes from the clear and convincing evidence, that as of February 19, 1997, both biological parents, Diane B. and John K., had failed to achieve such a degree of personal rehabilitation that would encourage the belief that within a reasonable time, considering the age and needs of the children, each could assume a responsible position in the life of the children. Connecticut General Statutes § 17a-112 (c)(3)(B). Both have failed to cooperate and participate in services. Diane B. has been unable to care for her children and unavailable to them due to her psychiatric disability and suspected substance abuse. Their father also has not rehabilitated to the point where it could be expected that he could care for them in the foreseeable future, even with sufficient services in place. The two children were adjudicated uncared-for children in a prior proceeding before the court. The court finds that the biological parents have shown a demonstrable lack of progress toward rehabilitation and their prognosis for future rehabilitation is poor.
"`Personal rehabilitation' as used in the statute refers to the restoration of a parent to his or her former constructive and CT Page 6742 useful role as a parent." In re Migdalia M. 6 Conn. App. 194,203, 504 A.2d 532 (1986). See also: In re Juvenile Appeal,1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802,474 A.2d 1259 (1984). Respondent father argues that because father had not ever had such role in the children's lives, the statutory grounds have not been met and that termination cannot occur. The court cannot accept such a strained interpretation of the termination of parental rights statute. Taking of one word, the word "former", out of context and emphasizing it to the exclusion of all others is not the conceptual thrust of the statute, is not logical and does it reflect the statutory intent. The court declines to adopt such an obviously strained interpretation. The court concludes as set forth in In re LuisC., 210 Conn., 157, 167, A.2d (1989) that:
 "the statute requires the trial court to analyze the respondents' rehabilitative status as it related to the needs of the particular child, and further, that such rehabilitation must be foreseeable `within a reasonable time."
Neither parent has been able to take the necessary steps to accomplish rehabilitation, and neither will be able to care for the children within the reasonably foreseeable future, even with substantial support services. Dr. Meier concluded that the likelihood of recovery was poor for both parents. The court finds, by clear and convincing evidence established at trial, that neither demonstrated that any rehabilitation had occurred nor that it was likely to occur within the reasonably foreseeable future. The court also finds from the clear and convincing evidence that this ground has existed for substantially longer than one year prior to the filing of the termination petitions on February 19, 1997.
 4. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112 (e) concerning Antony and Thursten B:
1) Appropriate and timely services were provided by the Department of Children and Families, including counseling, psychiatric referrals, visitation, transportation assistance, visitation coordination, referrals for alcohol assessment, parenting education and housing assistance. The services offered CT Page 6743 to both the mother and the father were extensive. Both parents refused many services and did not benefit from some of the services in which they did participate. Diane's psychiatric condition remains unchecked by regular medication and her suspected alcoholism has not been treated. She has not demonstrated any ability to be able to care for her children, due to her debilitating disability. John K. also has not taken advantage of services offered and remains unable to care for his children.
2) The court finds by clear and convincing evidence that the Department of Children and Families made reasonable efforts to reunify the family, given the situation and circumstances, as far as possible. The court finds the services which were offered, as previously found, were reasonable and extensive and that the parents were unwilling to take part in them and did not benefit from them. Those services included for the mother: individual counseling, counseling concerning domestic violence, a substance abuse evaluation, medical services, parenting education, visitation and visitation assistance and at times, offers of housing assistance. For the father, the services included, visitation and visitation assistance, counseling and evaluation services and parenting education. For both parents, case management services were offered by DCF.
3) The Department, with the approval of the Court, set reasonable and realistic expectations and service agreements in order to reunify the family. Diane did not comply with the reasonable expectations and John did so only minimally.
4) The children do have good ties with their maternal relatives, their foster family, who have provided the physical, emotional and educational support these children require. The children have only tenuous ties to their mother and father.
5) Finding regarding the age of the children. Antony and Thursten are now three and one-half years old. Their younger sibling, Alex, for whom termination is not sought, is one and a half years old.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the children to return them to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the children as part of an effort to CT Page 6744 reunite the children with the parents, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the children. Both parents have made only marginal efforts to adjust their circumstances to make it in the best interests of the children to be returned to them.
7) Finding regarding the prevention of the parents from having a meaningful relationship etc. No inappropriate conduct is noted. DCF has taken many steps to encourage the parents to have a meaningful relationship with the children and to rehabilitate themselves, which neither has been able to accomplish.
 5. DISPOSITION A. Charles Alexander B.
At issue in this case is whether it is in the best interests of Alex for his care to be committed to the custody of the Commissioner of the Department of Children and Families or whether his guardianship should be transferred to his maternal relatives. Those relatives, Michele H. and James B., have indicated that they do not wish the transfer for reasons related to Alex's considerable medical care needs. Having found that Alex is an uncared-for and neglected child, the court does not believe that a transfer of guardianship, in the face of the opposition of the relatives, is an appropriate outcome for Alex. Further, the evidence disclosed that Alex has significant medical needs and may well need specialized surgery in the years to come. The court concludes that it is in Alex's best interest that he be committed to the care and custody of the Commissioner of the Department of Children and Families and orders that commitment for a period of twelve months until May 21, 1999.
 B. Antony and Thursten B.
Antony and Thursten are thriving in the care of their maternal uncle and aunt. The court has found that their biological parents have not been rehabilitated and will not be able to care for the two children in the reasonably foreseeable future. The court-appointed expert, Dr. Meier, testified that the children were in need of permanency. Whether that permanency takes the legal form of adoption or a transfer of guardianship to their relatives is the remaining issue before the court. Both parents at trial were CT Page 6745 in favor of the transfer of guardianship, which would permit each an opportunity in the future to petition for the return of the children, should their personal circumstances change. Judy B., the primary caretaker of the twins, testified to no preference as to this outcome, stating that her main concern was that the twins have stability of care and not be moved again. Nonetheless, the court has serious concerns about the disruptive potential that future litigation concerning the children poses for them. John K. has already demonstrated, in his pro se filings before this court, what actions he is capable of taking. Raising the issue of a transfer of guardianship to him or to Diane B. at some time in the future along with claims of rehabilitation, if a transfer of guardianship were ordered by the court, would be the right and entitlement of both biological parents. The issue of the twins' placement could therefore remain unresolved during their entire minority. The court concludes, based on the evidence, that such lack of permanency in their placement is not in the twins' best interests.
The court finds, based upon the testimony and evidence presented, that it is in the best interests of Antony and Thursten to terminate the parental rights of Diane B. and John K. to them. These findings are made after considering the special needs of these children, the length of time they have been separated from their family of origin, and their demonstrated need for a secure and permanent environment as well as the totality of circumstances surrounding their lives. This court is aware of the "deleterious effect of prolonged temporary care of abused and neglected children." In re Juvenile Appeal (84-CD),189 Conn. 276, 455 A.2d 1313 (1983). While it is true that a transfer of guardianship would permit Antony and Thursten to remain where they presently are, it would not assure permanency and would not permit future litigation concerning them. As our Appellate Court has noted, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." In re Alexander V., 25 Conn. App. 741, 748, 596, A.2d 930 (1992); see generally, JOSEPH GOLDSTEIN, ET AL.,BEYOND THE BEST INTERESTS OF THE CHILD 99 (1979).
It is hereby ORDERED that the parental rights of Diane B. and John K. are terminated. The Commissioner of the Department of Children and Families is hereby appointed the statutory parent. If Judy and Roger B. continue to be willing to adopt the twins, the court directs that they be given first consideration. The court further orders that a permanency plan for Antony and CT Page 6746 Thursten be submitted within ninety days pursuant to state and federal law. A review plan for the children shall be filed in accordance with State and Federal Law.
Barbara M. Quinn, Judge Child Protection Session
[2] Petitioner's Exhibit 10.
[3] Petitioner's Exhibit 9, report dated April 8, 1996.
[4] Petitioner's Exhibit 7.
[5] Petitioner's Exhibit 11, Case review, Family Connections, Reunification/Visitation Center.
[6] Petitioner's Exhibit 12, Addendum to Social Study, dated November 28, 1997.
[7] Transcript December 2, 1997, p. 36.
[8] Petitioner's exhibit 10.
[9] Transcript, December 2, 1997, p. 10.